**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

LAURA YELLIN,

       Plaintiff,

      v.

ARLINGTON COUNTY SHERIFF JOSE
QUIROZ, JR., *et al.*,

      Defendants.

No. 1:24-cv-01216-PTG-WBP

**PLAINTIFF'S OMNIBUS MOTIONS IN LIMINE**

# TABLE OF CONTENTS

**Page**

I.    PLAINTIFF'S MIL#1: TO EXCLUDE DEFENDANTS' PREVIOUSLY UNDISCLOSED TRIAL WITNESSES .................................................................................1

II.    PLAINTIFF'S MIL#2: TO EXCLUDE POLICE BODY CAMERA VIDEOS ..............................................................................................................................4

    A.    Relevant Background ...............................................................................4

    B.    The Body Camera Videos Should Be Excluded Because Their Minimal Probative Value Is Substantially Outweighed by Unfair Prejudice, Jury Confusion, and the Risk of a Collateral Mini-Trial .......................5

        1.    The Body Camera Videos Have Minimal Relevance, If Any .....................................................................................6

        2.    The Body Camera Videos Are Highly Prejudicial ......................................7

III.    PLAINTIFF'S MIL#3: TO EXCLUDE OR LIMIT THE TESTIMONY OF MR. PATRICK YELLIN...............................................................................................7

    A.    Mr. Yellin's Testimony on the Subject Matters Disclosed by Defendants Is Inadmissible .........................................................................8

    B.    Mr. Yellin's Testimony on Other Topics Would Likewise Be Inadmissible .................................................................................................10

IV.    PLAINTIFF'S MIL#4: TO EXCLUDE PLAINTIFF'S DEPOSITION DESIGNATIONS ..................................................................................................11

V.    PLAINTIFF'S MIL#5: TO EXCLUDE THE TESTIMONY OF DR. CORINA FREITAS ...............................................................................................13

    A.    Legal Standard .........................................................................................13

    B.    Argument ...................................................................................................15

        1.    Dr. Freitas's Testimony Consists of Legal Opinions That Supplant the Jury, Warranting Exclusion. ................................15

        2.    Dr. Freitas Is Not Qualified To Opine on ADA/Rehabilitation Act Accommodations for Deaf Individuals.....................................................................................20

        3.    Dr. Freitas's Causation Opinion Relies on Her Inadmissible ADA Opinion and Is Therefore Unreliable. ............................................21

i

4.     Dr. Freitas's "Cruel and Unusual Punishment" Opinion Should Be Excluded Because Her Data and Methodology Are Unreliable, Under-disclosed, and Not Reliably Tied to Her Conclusions. ......................................................................22

     i.     Dr. Freitas's solitary-confinement opinion rests on an undefined standard. ................................................................22

     ii.     Dr. Freitas's psychometric-instrument opinions are unreliable because she failed to disclose the data relied on in her analysis. ................................................................23

     iii.     Dr. Freitas's opinions are unreliable because she inaccurately described her own assessment tools. .........................26

5.     Dr. Freitas's Deliberate Indifference to Medical Needs Opinion Should Be Excluded Because It Is Wholly Conclusory and No More Than Record Narration.....................................27

6.     Dr. Freitas Should Be Limited to the Opinions Disclosed in Her Report...........................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barber v. City of Chicago*,
    725 F.3d 702 (7th Cir. 2013) ...............................................................................................13

*Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*,
    144 F.4th 238 (4th Cir. 2025) ..............................................................................................28

*Bresler v. Wilmington Tr. Co.*,
    855 F.3d 178 (4th Cir. 2017) ...............................................................................................23

*Certain Underwriters at Lloyd's, London v. Sinkovich*,
    232 F.3d 200 (4th Cir. 2000) ...............................................................................................17

*Clear Touch Interactive, Inc. v. Ockers Co.*,
    171 F.4th 715 (4th Cir. 2026) .........................................................................................10, 11

*Coomer v. Lindell*,
    2025 WL 1354843 (D. Colo. May 9, 2025)...........................................................................13

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ...............................................................................................36

*Doe by Watson v. Russell Cty. Sch. Bd.*,
    292 F. Supp. 3d 690 (W.D. Va. 2018) ..................................................................................25

*Doe v. Coastal Carolina Univ.*,
    2021 WL 1651057 (D.S.C. Mar. 8, 2021) ............................................................................25

*ePlus, Inc. v. Lawson Software, Inc.*,
    764 F.Supp.2d 807 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) .......................33, 35

*Flagstone Dev. LLC v. Rocky Mountain Timberlands, LLC*,
    2017 WL 3820948 (D. Mont. Aug. 31, 2017) ......................................................................31

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................................................................22

*Hoyle v. Freightliner, LLC*,
    650 F.3d 321 (4th Cir. 2011) ..............................................................................................9, 11

*Lujan v. Cabana Mgmt., Inc.*,
    284 F.R.D. 50 (E.D.N.Y. 2012)............................................................................................12

*United States ex rel. Lutz v. Lab'y Corp. of Am. Holdings*,
    2021 WL 2801736 (D.S.C. July 6, 2021), *clarified on denial of
    reconsideration,* 2022 WL 688988 (D.S.C. Feb. 23, 2022)..................................................33

*Moore v. Barnes*,
  802 F. Supp. 3d 792 (E.D.N.C. 2025).................................................................................22

*Nelson v. City of Chicago*,
  810 F.3d 1061 (7th Cir. 2016) ......................................................................................13, 15

*Plantan v. Smith*,
  2024 WL 3048648 (E.D. Va. June 18, 2024) ................................................................22, 33

*Richardson v. Maximus, Inc.*,
  2023 WL 4687188 (E.D. Va. July 21, 2023) ........................................................................11

*Riddick v. Norfolk S. Ry. Co.*,
  2022 WL 1180018 (E.D. Va. Apr. 20, 2022), *objections overruled,* 2022 WL
  2614877 (E.D. Va. May 6, 2022)........................................................................................26

*Russell v. Absolute Collection Servs., Inc.*,
  763 F.3d 385 (4th Cir. 2014) ..............................................................................................22

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
  318 F.3d 592 (4th Cir. 2003) ................................................................................................9

*Savatxath v. Demer*,
  2018 WL 6258558 (N.D.N.Y. Nov. 30, 2018) .....................................................................13

*Searls v. Johns Hopkins Hosp.*,
  158 F. Supp. 3d 427 (D. Md. 2016).....................................................................................29

*Sims v. BMW of N. Am. LLC*,
  2025 WL 1018379 (M.D. Fla. Apr. 4, 2025).........................................................................13

*Small v. WellDyne. Inc.*,
  927 F.3d 169 (4th Cir. 2019) ..............................................................................................22

*United States v. Barile*,
  286 F.3d 749 (4th Cir. 2002) .........................................................................................23, 27

*United States v. Johnson*,
  617 F.3d 286 (4th Cir. 2010) ..............................................................................................17

*United States v. McIver*,
  470 F.3d 550 (4th Cir. 2006) ..............................................................................................23

*United States v. Perkins*,
  470 F.3d 150 (4th Cir. 2006) .....................................................................................23, 26, 27

*Yates v. Ford Motor Co.*,
  2015 WL 3448905 (E.D.N.C. May 29, 2015) ................................................................23, 26

**Statutes**

ADA ........................................................................................................................... *passim*

Rehabilitation Act ................................................................................................... *passim*

**Other Authorities**

28 C.F.R. § 35.160 ...........................................................................................................28

Nat'l Ctr. for PTSD, U.S. Dep't of Veterans Affs., *Clinician-Administered PTSD
    Scale for DSM-5 (CAPS-5) Clinician Training Curriculum*,
    https://www.ptsd.va.gov/professional/continuing_ed/caps5_clinician_
    training.asp ..............................................................................................................35

Nat'l Ctr. for PTSD, U.S. Dep't of Veterans Affs., *Clinician-Administered PTSD
    Scale for DSM-5 (CAPS-5)*, https://ptsd.va.gov/professional/assessment/adult-
    int/caps.asp ..........................................................................................................26, 27

Fed. R. Civ. P. 26 ..................................................................................................... *passim*

Fed. R. Civ. Pro. 32(a) ...................................................................................................20

Fed. R. Civ. Pro. 37 .................................................................................................. *passim*

Fed. R. Evid. 402 .......................................................................................................16, 18

Fed. R. Evid. 403 ...................................................................................................... *passim*

Fed. R. Evid. 608 .............................................................................................................13

Fed. R. Evid. 701 .......................................................................................................16, 17

Fed. R. Evid. 702 ...................................................................................................... *passim*

Fed. R. Evid. 704 .............................................................................................................27

I.      **PLAINTIFF'S MIL#1: TO EXCLUDE DEFENDANTS' PREVIOUSLY UNDISCLOSED TRIAL WITNESSES**

Plaintiff Laura Yellin respectfully moves in limine to preclude Defendants from calling at trial any of the 16+ witness listed in Defendants' final pretrial disclosures who were never identified in Defendants' initial disclosures or any supplement thereto.

Rule 26(a)(1) required Defendants to identify—at the outset of discovery—each person likely to have discoverable information that Defendants may use to support their defenses, along with the subjects of that information and each person's address and telephone number.  Rule 26(e) also required Defendants to supplement those disclosures in a timely manner.  When a party fails to identify a witness as required by Rule 26(a) or 26(e), Rule 37(c)(1) provides that the party may not use that witness at trial unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The Fourth Circuit treats this exclusion remedy as automatic unless the nondisclosing party carries its burden to prove substantial justification or harmlessness.  *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329–30 (4th Cir. 2011); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596–98 (4th Cir. 2003).

Here, Defendants served their initial disclosures on August 27, 2025, identifying 76 persons with potentially discoverable information. Ex. A.  Defendants never supplemented those initial disclosures.  On December 17, 2025, Defendants filed their final pretrial disclosures, identifying 29 witnesses Defendants "expect to call," and 29 *additional* witnesses that Defendants "may call," plus unidentified foundation and custodian witnesses.  ECF 94.  Among the "may call" witnesses are the following persons that were not identified in Defendants' initial disclosures:

1.    Matt Huray
2.    Katie Huray
3.    Officer Bennett
4.    Donna McKary, LPN
5.    Shaday Mercado, LPN
6.    Michael Derara, RN

1

7.     Omowumi Olawumi, RN
8.     Sheldon Bullock, LPN
9.     Jacqueline Anyiwo, LPN
10.    Yodit Belete, LPN
11.    Mohammad Azam, LPN
12.    Genesis Bettis, LPN
13.    Zainab Alkebsi
14.    Mike Perlmann
15.    Jamie Borg
16.    Dr. Laeli Wilson

Because Defendants never identified these persons as part of their initial disclosures, the Court should order that Defendants cannot call these persons as witnesses at trial.

"A party that fails to provide [witness] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case. Therefore, Rule 37(c)(1) of the Federal Rules of Civil Procedure requires witness exclusion for untimely disclosure, even rebuttal witnesses, unless the violation is substantially justified or harmless." *Clear Touch Interactive, Inc. v. Ockers Co.*, 171 F.4th 715, 731–32 (4th Cir. 2026) (internal quotation marks and citations omitted). District courts have "broad discretion" to consider whether untimely disclosure is substantially justified or harmless, and "may consider the surprise to the opposing party, the ability to cure that surprise, the disruption to the trial, the importance of the evidence, and the explanation for nondisclosure." *Id*. (citing *S. States Rack & Fixture*, 318 F.3d at 597). The party seeking to excuse a failure to disclose—here, Defendants—bears the burden of demonstrating that these factors supporting allowing the witnesses to testify. *Id*.

Here, Defendants cannot satisfy their burden to excuse non-disclosure. First, the surprise is substantial—16 witnesses, none of whom were disclosed in any party's initial disclosures and none of whom were deposed.

2

Second, the surprise cannot reasonably be cured. Reopening discovery to allow depositions of 16 additional witnesses would not only be infeasible, it would be disproportionate, expensive, and inconsistent with the Court's schedule. *See Clear Touch Interactive*, 171 F.4th at 731–32 (affirming exclusion of witness first named after discovery deadline because opposing party lost opportunity to depose and prepare for cross-examination).

Third, allowing these witnesses would disrupt trial. Plaintiff would need to investigate each witness, determine the subjects of testimony, obtain documents, prepare cross-examinations, and potentially seek further discovery or rebuttal evidence. That disruption is exactly what Rule 26(a)(1) and Rule 26(e) are meant to avoid.

Fourth, to the extent Defendants argue these witnesses are important, that only strengthens the need for exclusion. Important witnesses should have been disclosed early enough for Plaintiff to test their testimony in discovery. The more important the testimony, the more prejudicial the nondisclosure.

Fifth, Defendants have no adequate explanation. They knew—or should have known— during discovery which individuals they might use to support their defenses. If additional witnesses became important, Defendants were required to supplement their disclosures in a timely manner. To the extent Defendants point to stray references to one or more of these persons in discovery that would not be sufficient to excuse their late disclosure. Courts consistently hold that the mere mention of a person in discovery—whether through a document production or even by a witness during a deposition—does not automatically excuse non-disclosure, including because it does not indicate whether and how a party intends to rely on those persons to support their claims or defenses. *See, e.g.*, *Hoyle*, 650 F.3d at 330 (affirming exclusion where a witness was referenced in deposition testimony but not identified as a potential witness); *Richardson v. Maximus, Inc.*,

3

2023 WL 4687188, at *2 (E.D. Va. July 21, 2023) (same); *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 72 (E.D.N.Y. 2012) (collecting cases for the proposition that "the mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A)(i)").

Accordingly, Plaintiff respectfully requests that the Court order that Defendants may not call at trial any of the 16 witness identified above who were not included in Defendants' initial disclosures.

## II.   PLAINTIFF'S MIL#2: TO EXCLUDE POLICE BODY CAMERA VIDEOS

Plaintiff respectfully moves in limine to preclude Defendants from introducing body-camera footage reflecting prior police encounters involving Ms. Yellin. This evidence is of little to no probative value and would cause substantial unfair prejudice.

### A.   Relevant Background

In May 2023, Ms. Yellin gave birth to her son and soon thereafter was diagnosed with postpartum psychosis. On or around June 16, 2023, her then-husband, Patrick Yellin, obtained an emergency protective order against her. Ms. Yellin was first arrested on June 21, 2023 for alleged violation of a protective order, and was released. On July 15, 2023, while still suffering from postpartum-related mental-health conditions, Ms. Yellin went to her home to retrieve belongings, and was later arrested for allegedly violating the protective order and making a false police report. Ms. Yellin was then transported to the Arlington County Detention Facility, where the events at issue in this case began.

Defendants' Exhibit List identifies 10 separate "Videos of Yellin from Arlington Police" (DX36). *See* ECF 97. These videos include Arlington County police interactions with Ms. Yellin and appear to have been filmed over 6 separate days in June and July 2023. *See id*. at DX36 (identifying six separate dates for videos). All of these police interactions took place before Ms. Yellin was committed to the Arlington County Detention Facility ("ACDF"), while two of the

4

videos show her being escorted into the ACDF on July 15, 2023.  The videos show, among other things, Ms. Yellin arguing with police officers during a psychotic episode, Ms. Yellin being placed into handcuffs, police officers searching Ms. Yellin while she is in handcuffs, and Ms. Yellin sitting while handcuffed being questioned by police officers.

**B.      The Body Camera Videos Should Be Excluded Because Their Minimal Probative Value Is Substantially Outweighed by Unfair Prejudice, Jury Confusion, and the Risk of a Collateral Mini-Trial**

Courts routinely exclude or limit body-camera footage and related prior arrest evidence—including in civil rights cases—where its limited probative value is outweighed by prejudice, jury confusion, improper credibility use, or the risk that the jury will misuse collateral evidence. *See, e.g.*, *Coomer v. Lindell*, 2025 WL 1354843, at *3–4 (D. Colo. May 9, 2025) (excluding body-camera footage of an unrelated encounter under Rules 608(b) and 403); *Sims v. BMW of N. Am. LLC*, 2025 WL 1018379, at *4 (M.D. Fla. Apr. 4, 2025) (excluding traffic citations and related body-camera footage where admission would circumvent Rule 608 and cause prejudice); *Savatxath v. Demer*, 2018 WL 6258558, at *2 (N.D.N.Y. Nov. 30, 2018) (precluding prior-arrest evidence, including body-camera footage, in civil-rights case); *Nelson v. City of Chicago*, 810 F.3d 1061, 1071–73 (7th Cir. 2016) (noting in 404(b) context that evidence of prior arrests "generally impugns character" and invites an inference that plaintiff is a "serial law breaker and general troublemaker").  Indeed, evidence of a plaintiff's prior arrests in a civil rights case under § 1983 "presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motives, such as a belief that bad people should not be permitted to recover from honorable police officers." *Barber v. City of Chicago*, 725 F.3d 702, 714–17 (7th Cir. 2013).

5

### 1.     The Body Camera Videos Have Minimal Relevance, If Any

Here, the body-camera footage of Ms. Yellin has minimal, if any, probative value to the issues in the case.  Ms. Yellin's constitutional claim pertains exclusively to the conditions of her confinement in the ACDF; her pre-detention interactions with police have nothing to do with those conditions.  The evidence is also irrelevant to her ADA and Rehabilitation Act claims, which address whether Defendants provided Ms. Yellin effective communication and proper accommodations while she was detained in the ACDF; again, her pre-detention interactions with police have nothing to do with those facts and circumstances.

To the extent Defendants intend to introduce body-cam evidence as evidence of her communication abilities, that evidence would be of only the thinnest relevance. That Ms. Yellin may have spoken to police officers in a manner they could understand says nothing about what she understood, misunderstood, guessed at, or failed to convey without an ASL interpreter.  Further, the legal standard under the ADA and Rehabilitation Act is not whether Ms. Yellin can sometimes speak, write, or attempt to communicate in isolated circumstances—it is whether Defendants took appropriate steps to ensure effective communication during ACDF booking, classification, medical and mental-health interactions, grievance processing, and access to communication services. Evidence from separate encounters—involving different officers, a different physical setting, different communication demands, and different surrounding circumstances (including whether Ms. Yellin was wearing a cochlear implant)—does not bear on whether Defendants discharged their statutory obligations *within* the ACDF. The prior encounters and the ACDF detention are simply not the same events, and apparent communication in one setting does not evidence effective communication in the other.

6

### 2.    The Body Camera Videos Are Highly Prejudicial

The body-camera footage of Ms. Yellin is also highly prejudicial and otherwise improper under Rule 403.  Presenting this evidence to the jury would inevitably focus the jury on her prior adverse encounters with police on several different occasion. The jury would see her being handcuffed, searched and questioned, and taken in and out of buildings by uniformed police officers while in handcuffs, and all while suffering from a form of psychosis—these are powerful images that risk tainting Ms. Yellin's character and casting her as a "serial law breaker and general troublemaker" (*Nelson*, 810 F.3d at 1071–73), particularly when the circumstances of her arrest have nothing to do with the issues the jury will be asked to decide.

Admitting the body camera videos would also require resolving a series of collateral disputes: the circumstances of the prior encounter, the nature of the communication that occurred, whether Ms. Yellin was or was not wearing a cochlear implant, what accommodations were or were not provided, and whether any apparent communication was accurate or effective. Each of those disputes would consume limited trial time, distract the jury from Defendants' conduct at issue, and require the Court to manage an embedded subsidiary proceeding that has nothing to do with what happened at ACDF.  Rule 403 is designed to prevent exactly that outcome.

The Court should bar Defendants from introducing the body-camera footage at trial.

### III.    PLAINTIFF'S MIL#3: TO EXCLUDE OR LIMIT THE TESTIMONY OF MR. PATRICK YELLIN

Plaintiff hereby moves in limine to exclude, or limit, the trial testimony of Mr. Patrick Yellin, Plaintiff's ex-husband.  Mr. Yellin has no personal knowledge of any of the factual issues the jury will be called upon to consider.  He was not present during any portion of her confinement, and thus he has no first-hand knowledge of the conditions of her confinement or whether Defendants provided her effective communication and proper accommodations while she was

7

detained at the ACDF.  Further, Mr. and Ms. Yellin have a history of litigation between them over divorce and child custody issues, raising the prospect that Defendants will use his testimony in an attempt to impugn Ms. Yellin's character and distract the jury with irrelevant, extraneous, and prejudicial issues.  His testimony thus should be excluded under Rules 402, 403, and 701.

**A.    Mr. Yellin's Testimony on the Subject Matters Disclosed by Defendants Is Inadmissible**

In their initial disclosures, Defendants identified only two subject matters for Mr. Yellin's testimony:  (1) "[i]nformation relating to protective orders entered against plaintiff and violations of such orders by plaintiff," and (2) "information relating to plaintiff's physical and mental condition."  Ex. A.  Mr. Yellin's potential testimony on these topics is inadmissible.

First, information about Ms. Yellin's violations of protective orders is irrelevant because it concerns only the circumstances that led to her arrest and detention—not Defendants' treatment of Ms. Yellin while she was detained.  Because the jury will know Ms. Yellin was detained at the ACDF, they will necessarily understand that she was arrested.  However, the jury does not need to know the details and reasons for her arrests, including why she was the subject of a protective order obtained by her husband in the first place.  This type of information will not assist the jury in weighing the evidence or in answering any of the ultimate questions before it.  Moreover, as discussed above in connection with body-cam footage, the details of Ms. Yellin's prior arrests raises a substantial risk of unfair prejudice and confusion of the issues that would greatly outweigh any marginal probative value the evidence may present.

Second, Mr. Yellin's testimony about Ms. Yellin's physical and mental condition would be inadmissible for several reasons.  As an initial matter, it would be improper lay opinion testimony under Rule 701, which prohibits non-expert opinions "based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). This prohibition was added to ensure that

litigants do not evade the reliability requirements by proffering "expert testimony dressed in lay witness clothing." *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (quoting *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006); *see also Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (explaining that Rule 701 "generally does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." (citation and internal quotation marks omitted)).

Any attempt by Mr. Yellin to opine about Ms. Yellin's mental health diagnoses or condition, and any relationship between Defendants' treatment and those diagnoses or conditions, would be improper and inadmissible. Mr. Yellin is not a medical doctor, nor is he a mental health practitioner. He does not have the medical expertise to diagnose Ms. Yellin, nor does he have the specialized knowledge, skill, or education required to opine concerning any diagnoses. As such, his opinion concerning her mental health diagnoses must be excluded under Rule 701.

Further, such testimony would likewise be inadmissible for lack of foundation and personal knowledge. Any observations Mr. Yellin has about Ms. Yellin's condition *before* she was detained are of minimal, if any, relevance because there is no dispute that Ms. Yellin was suffering from post-partum psychosis before and during her time in jail. Further, because of the protective order in place, Mr. Yellin had very few interactions with Ms. Yellin at all when she left the ACDF until their divorce and custody disputes. He was not present for her treatment and has no personal knowledge of the diagnoses or treatment she received. Further, any testimony from Mr. Yellin on these issues would be highly unreliable and potentially misleading, particularly where trial may include the testimony of Ms. Yellin's treating healthcare providers and expert witnesses. Whatever probative value Mr. Yellin's personal observations and characterization of Ms. Yellin's mental

9

health might carry is substantially outweighed by the dangers of confusing the issues and misleading the jury.

### B.    Mr. Yellin's Testimony on Other Topics Would Likewise Be Inadmissible

Because Defendants disclosed only two subject matters of Mr. Yellin's testimony in their initial disclosures under Rule 26(a)(1), they are precluded from eliciting trial testimony from Mr. Yellin on other topics under Rule 37(c).  *See* Fed. R. Civ. P. 26(a)(1)(A)(i) (requiring disclosure not only of witnesses likely to have discoverable information but also "the subjects of that information—that the disclosing party may use to support its claims or defenses"); Fed. R. Civ. P. 37(c) (failure to disclose under Rule 26(a) precludes party from "us[ing] that information or witness to supply evidence . . . at a trial").  Such testimony would be inadmissible in all events.

For example, undisclosed testimony by Mr. Yellin concerning the contested child custody proceedings between Mr. and Ms. Yellin, as well as their divorce proceedings, would be irrelevant, distract from the key issues, and waste the Court and jury's time.  Permitting testimony on these matters would create a significant risk of a mini-trial on collateral matters, as well as a risk that Defendants attempt to impugn Ms. Yellin's character and paint her in an unfairly negative light. If Defendants are permitted to introduce evidence or elicit testimony concerning the child custody case through Mr. Yellin, Plaintiff would be entitled to respond, including with testimony about Mr. Yellin, leading to a protracted collateral dispute about the details, circumstances, and outcomes of a family law matter that have no bearing on the issues in this case. How Ms. Yellin and Mr. Yellin divided their marital assets and arranged custody of their children, and the tone of their interaction during those messy legal battles is wholly irrelevant to the issues in this case and risks creating a sideshow that will distract from adjudicating the constitutional and statutory rights at issue. As such, the testimony should not be allowed under Rules 402 and 403.

10

Likewise, undisclosed testimony by Mr. Yellin about how Ms. Yellin communicates would also constitute inadmissible lay opinion testimony, and would present minimally probative evidence for which there is a substantial risk of jury confusion.  Mr. Yellin is deaf and communicates with Ms. Yellin through a combination of ASL and speech, at times assisted by Ms. Yellin's cochlear implants.  He is not a communication or linguistic expert, including on the particular issues of providing effective communication for deaf persons in mental health or carceral settings.  While Ms. Yellin identified such an expert (Roger Williams) in discovery and intends to present his testimony at trial, Defendants disclosed no rebuttal expert on these issues.  This underscores the risk that Defendants will attempt to use Mr. Yellin as a quasi rebuttal expert, which would be wholly improper.  Mr. Yellin is not an expert, and any testimony about how he personally communicated with Ms. Yellin before she was detained is of minimal, if any, probative value on what kinds of accommodations Ms. Yellin needed to communicate effectively while she was detained at ACDF.

### C.    Conclusion

Ms. Yellin respectfully requests that the Court enter an order precluding Defendants from presenting trial testimony from Mr. Patrick Yellin. In the alternative, at a minimum, the should preclude Mr. Yellin from testifying about (1) whether Ms. Yellin was provided effective communication at the ACDF; (2) how Defendants' treatment of Ms. Yellin affected her mental health; (3) any medical or mental health diagnoses of Ms. Yellin; and (4) the circumstances surrounding Ms. Yellin's arrest; and (5) Ms. Yellin's divorce and custody dispute with Mr. Yellin.

### IV.    PLAINTIFF'S MIL#4: TO EXCLUDE PLAINTIFF'S DEPOSITION DESIGNATIONS

Plaintiff hereby moves in limine to exclude bar Defendants from presenting any of the deposition designations they included in their final pretrial disclosures.  In those disclosures,

Defendants identified portions of deposition testimony from several of Ms. Yellin's family members—Jennifer Cunningham, John Cunningham, Mary ("Toni") Cunningham, and Caitlin Cunningham—as well as Ms. Yellin's defense attorney, Mr. Faraji Rosenthall.  ECF 94 at 3-4. However, the deposition designations do not qualify for use under Federal Rule of Civil Procedure 32(a). Each witness lives within 100 miles of the Court and Defendants admitted to undersigned counsel during a meet and confer that they have no reason to believe any of these witnesses are otherwise unavailable.  *See* ECF 118-2 (e-mail correspondence memorializing meet and confer); Ex. F, Deposition of Jennifer Cunningham 7:9–11 (Nov. 3, 2025); Ex. G, Deposition of John Robert Cunningham 6:10–13 (Nov. 4, 2025); Ex. H, Deposition of Mary A. Cunningham 9:1–3 (Nov. 4, 2025); Ex. I, Deposition of Caitlin Cunningham 6:11–14 (Nov. 6, 2025); Ex. J, Subpoena to Notice of Deposition of Faraji Rosenthall, Esq. 3 (Nov. 24, 2025**)**.

Further, while Defendants previously stated that they intend to use their designations for impeachment purposes only (*see* ECF 118 at 2), Rule 26(a)(3)(A) expressly excludes evidence used "solely for impeachment" from the pretrial disclosure/designation requirement.  Further, none of the witnesses have been listed on Defendants' witness list, and only two (Mary ("Toni") Cunningham and Jennifer Cunningham) were on Plaintiff's witness list. *See* Rule 26(a)(3)(A)(ii) (requiring parties to designate "those witnesses whose testimony the party expects to present . . ." (emphasis added)).  Accordingly, Plaintiff requests the Court order that Defendants may not present any of their deposition designations, other than for impeachment purposes only.

To the extent the Court permits any of these deposition designations to be presented by Defendants, Plaintiff preserves and does not waive any objections to specific portions of the designated testimony.

## V.      PLAINTIFF'S MIL#5: TO EXCLUDE THE TESTIMONY OF DR. CORINA FREITAS

Plaintiff respectfully moves in limine to exclude the testimony of Defendants' expert, Dr. Corina Freitas. Her opinions attempt to state legal standards, apply legal elements, decide ADA or Rehabilitation Act liability, narrate selected records, and introduce undisclosed causation theories.

Dr. Freitas is a forensic psychologist, but her opinions in this case are legal ones. Rather than a true psychiatric assessment, her exert report consists largely of cherry picked collection of records and a series of undisclosed assessments that purport to justify what she acknowledges to be opinions on legal question. She describes her own opinion as whether or not Defendants acted with "deliberate indifference," whether Ms. Yellin's housing conditions constituted "cruel and unusual punishment," whether Defendants "violated the ADA and Rehabilitation Act," and whether "violations" of these law caused Ms. Yellin's damages. She justifies her opinions through a series of undisclosed assessments, rendering it impossible for this Court to assess the reliability of her methodology and, in some instances, which methodology she even applies. Additionally, she provides her ADA and Rehabilitation Act opinions despite having no clinical experience or qualifications in determining the accommodations needed for someone who is deaf.

Federal Rules of Evidence 702, 704, and 403 and Federal Rules of Procedure 26 an 37 do not permit Defendants to present legal arguments through a psychiatrist, or to allow an expert lacking qualifications, a reliable methodology, or disclosed factual bases to opine. Such testimony is not helpful to the jury and should be excluded.

### A.      Legal Standard

Federal Rule of Evidence 702 permits expert testimony only if the proponent of the expert can demonstrate "that it is more likely than not that": "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in

13

issue"; "(b) the testimony is based on sufficient facts or data"; "(c) the testimony is the product of reliable principles and methods"; and "(d) the expert's opinion reflects a reliable application of those principles and methods to the facts of the case." Fed. R. Evid. 702. Expert testimony must be both relevant and reliable before it reaches the jury. *Plantan v. Smith*, 2024 WL 3048648, at *5 (E.D. Va. June 18, 2024) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). A court may exclude opinion testimony when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Small v. WellDyne. Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'").

The 2023 amendment to Rule 702 "clarif[ied] that the proponent of expert testimony bears the burden of establishing its admissibility" and "emphasize[d] that an expert's opinion must stay within the bounds of a reliable application of the expert's basis and methodology." *Moore v. Barnes*, 802 F. Supp. 3d 792 (E.D.N.C. 2025) (quoting *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025)).

Rule 26(a)(2)(B) requires an expert report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "The purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). "Accordingly, a party who fails to comply with the expert witness disclosure rules is prohibited from 'us[ing] that information or witness to supply evidence…at a trial, unless the failure was substantially justified or is

14

harmless.' Fed. R. Civ. P. 37(c)(1) … The party failing to disclose information bears the burden of establishing the nondisclosure was substantially justified or was harmless." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (internal citation omitted).

### B.    Argument

Dr Freitas's testimony should be excluded as it constitutes an improper legal opinion, extends beyond her qualifications, relies on undisclosed facts and data, and does not reliably apply its methodology.

### 1.    Dr. Freitas's Testimony Consists of Legal Opinions That Supplant the Jury, Warranting Exclusion.

"[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 561–62 (4th Cir. 2006). "This is because such testimony is less likely to be helpful to the jury." *Yates v. Ford Motor Co.*, 2015 WL 3448905, at *6 (E.D.N.C. May 29, 2015) (citing *United States v. Offil*, 666 F.3d 168, 175 (4th Cir. 2011); *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002)). To determine whether opinion testimony contains legal conclusions, the court first considers whether the question the expert is answering "tracks the language of the legal principle at issue or of the applicable statute," and then whether those terms "have specialized legal meaning." *Barile*, 286 F.3d at 760. "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." *United States v. Perkins*, 470 F.3d 150, 157 (4th Cir. 2006) (quoting *Barile*, 286 F.3d at 759–60 (quoting Fed. R. Evid. 704 advisory committee's notes)). Even in the "difficult" situation "[w]hen the common and legal meanings of a term are not easily unfurled from each other," a court will still "conclude that testimony was unhelpful to the jury" if "the testimony actually framed the term in its traditional legal context." *Id.* at 160.

15

Here, Dr. Freitas's opinions are clearly objectionable because she *claims* to answer legal questions, apply legal standards, and track the legal definition of terms. In her report, she states she reviewed records "to determine" answers to the following questions:

> I. Section 1983 Claim: Cruel and Unusual Punishment (8th and 14th Amendments)
> - Whether the conditions of confinement to which the plaintiff was subjected were, objectively, "sufficiently serious" to deprive her of the minimal civilized measure of life's necessities, and whether any alleged deprivation was "extreme" as required by relevant case law.
> - Whether any prison official acted with deliberate indifference, i.e., with knowledge of and disregard for a substantial risk of serious harm to the plaintiff's health or safety, including both medical and psychiatric risks.
> - Whether any injury or damages claimed by the plaintiff (including physical, psychiatric, or emotional injury) were caused by the alleged violations, or whether such injuries are attributable to pre-existing conditions, other events or circumstances, or are not substantiated by the available evidence.
> II. ADA and Section 504 of the Rehabilitation Act Claims
> - Whether the plaintiff has a qualifying disability and was otherwise qualified to receive the benefits of the public services, programs, or activities at issue.
> - Whether the plaintiff was denied the benefits of such services, programs, or activities on the basis of her disability, including whether there was:
>     o Intentional discrimination or disparate treatment,
>     o Disparate impact, or
>     o Failure to provide reasonable accommodations.
> - Whether reasonable accommodations were provided, including access to interpreters, communication devices, and other supports, and whether any alleged deficiencies in accommodation resulted in harm.

Ex. B, Expert Report of Corina Freitas, M.D., M.Sc., M.B.A. at 1, (Oct. 24, 2025). She has "attempted to offer opinions and answer all of th[e]se inquiries." Ex. C, Deposition of Corina Freitas, M.D., M.Sc., M.B.A., 35:1–6 (Nov. 10, 2025); *see also id.* 154:4–16 (her conclusions were "formed" by "legal questions that [she] was asked").

Dr. Freitas goes on to recite legal standards for a § 1983 conditions of confinement claim, selected by defense counsel, *see id.* 38:7-12., including such legal terms as "objectively, sufficiently serious," "deliberate indifference," "substantial risk of serious harm," the requirement that a deprivation be "extreme," and what it means to have "a culpable state of mind." Ex. B at 2. She relied on these legal definitions when forming her opinions on "whether or not there was

deliberate indifference in this case." *See, e.g.*, Ex. C 41:14–42:6 (considering this definition of what it means "to have a culpable state of mind" when determining her opinions on deliberate indifference and accommodations); *id.* 40:22-41:9 (relying on the legal definition that "to be sufficiently serious, a deprivation has to be extreme"); 38:13-39:2 (saying she has a "medical opinion," rather than a definition from counsel, of what is "objectively sufficiently serious"). This testimony again confirms that Dr. Freitas is not merely offering clinical psychiatric opinions to help the jury understand the evidence, but she explicitly purports to answer the legal questions in this case that are rightfully reserved to the jury. *See Doe v. Coastal Carolina Univ.*, 2021 WL 1651057, at *3 (D.S.C. Mar. 8, 2021) (excluding expert testimony about whether a university's conduct violated Title IX because "such opinions are beyond the proper role of an expert witness and would supplant the jury's role in evaluating and determining the facts"); *Doe by Watson v. Russell Cty. Sch. Bd.*, 292 F. Supp. 3d 690, 718 (W.D. Va. 2018) (finding expert testimony that defendants were "deliberately indifferent" and that the failure to provide adequate policy or training was a proximate cause of the harm was impermissible because it would "supplant the jury's role").

Dr. Freitas's maps her report onto these legal questions: section one of her "forensic opinion and discussion" section addresses whether Ms. Yellin had "substantial medical risks" and "psychiatric risks" opines that her needs were not "neglected," Ex. B at 17, tracking with the "deliberate indifference" standard, *see id.* at 1; Ex. C 41:14–42:6 (testifying that she is "offering a deliberate indifference opinion") and the "substantial risk of serious harm," Ex. B at 2. Section two of her "forensic opinion and discussion" addresses whether the conditions of her confinement were "sufficiently serious to deprive her of the minimal civilized measure of life's necessities" and "extreme," Ex. C 35:15–36:17, so as to warrant "cruel and unusual punishment," Ex. B at 18. She

17

also describes section two as going towards answering "whether any prison official acted with deliberate indifference" opinion. *See* Ex. C 36:18–37:9. In section three, she opines that Ms. Yellin's conditions meet "the definition of disability under the ADA and Section 504," there was "no evidence in the record of intentional discrimination or disparate treatment on the basis of Ms. Yellin's disabilities" and that accommodations were not "categorically denied or withheld" to conclude the ADA and Rehab Act were not violated. *See* Ex. B at 18–19; Ex. C 37:22–38:2. And section four, in addressing damages and causation under Section 1983, *id.* 37:10–21, opines that that Ms. Yellin's symptoms were not "directly caused or substantially exacerbated by any specific violation of disability law," Ex. B at 19.

These are not psychiatric opinions that merely apply psychiatric expertise to the facts of the case; they are legal conclusions framed in the terminology of and designed to answer specific legal questions and, in turn, tell the jury how to answer those questions. Thus, they must be excluded. *See Perkins*, 470 F.3d at 158; *Yates*, 2015 WL 3448905, at *7-8 (excluding testimony "as to whether defendants acted 'reasonably'" and "whether a warning or instruction was 'adequate'"). "[C]onclusory opinion testimony using terms having specialized legal meaning such as 'discrimination,' 'negligent,' or 'fraudulent ... scheme' are freighted with 'considerable legal baggage' and 'such testimony nearly always invades the province of the jury.'" *Riddick v. Norfolk S. Ry. Co.*, 2022 WL 1180018, at *5 (E.D. Va. Apr. 20, 2022) (citation omitted), *objections overruled,* 2022 WL 2614877 (E.D. Va. May 6, 2022).

Moreover, though Dr. Freitas is not a lawyer, she attempted to apply her personal knowledge of the law in reaching her conclusions, which invades the Court's authority to instruct the jury on the law. When asked what informed her understanding of the ADA, she testified that her "understanding of the ADA Act" "inform[ed her] understanding of whether a violation

18

occurred or not." Ex. C 44:1–7. Her knowledge of the law is also unreliable. Though she offers an opinion on whether the Rehabilitation Act was violated, she could not recall what that law was and only had "a general understanding" and "some familiarity" with it. *Id*. 44:13–45:3. Yet, she opines that "the ADA and Rehabilitation Act were not violated." *Id*. at 45:4–7.

Although determining when ultimate issue testimony is proper can sometimes be a difficult task, this is not such a case. Consider the example provided by the Advisory Committee to Rule 704: an expert may not be asked whether a person "[had] capacity to make a will" but may be asked whether the person "[had] sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution." Fed. R. Evid. 704 advisory committee's note. Dr. Freitas is on the wrong side of the line as all of the opinions she purports to have in this case directly answer legal question, not the underlying fact question, by answering whether Defendants were deliberately indifferent, whether Ms. Yellin's conditions were sufficiently serious or extreme, whether ADA/Rehabilitation Act violations occurred, and whether accommodations were reasonable, rather than limiting herself to underlying psychiatric facts. Dr. Freitas's testimony *purports* to fall on the wrong side of the line, as she herself "framed" her opinions and the "term[s]" used in their "traditional legal context." *See Perkins*, 470 F.3d at 160; *see also Barile*, 286 F.3d at 760 ("[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination").

Dr. Freitas's testimony should be excluded. Her testimony would not assist the jury but would instead substitute opposing counsel's and her own understanding of the law for the Court's instructions and Dr. Freitas's legal conclusions for the jury's fact-finding role. Because the legal-opinion problem permeates the entirety of her disclosed opinions, exclusion in full is warranted.

19

**2.      Dr. Freitas Is Not Qualified To Opine on ADA/Rehabilitation Act Accommodations for Deaf Individuals.**

Dr. Freitas's ADA/Rehabilitation Act opinions also exceed her expertise. An expert may only testify within the scope of the knowledge, skill, experience, training, or education that qualifies the expert. Fed. R. Evid. 702. *See Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 254 (4th Cir. 2025) (affirming exclusion of expert for lack of qualification). Dr. Freitas has never before made the type of accommodation determination she purports to make here. She testified that she has never, in her clinical capacity, made a determination about what accommodations were needed for someone who is deaf. Ex. C 113:19–23. She has treated only "maybe three or four" deaf patients; she is "not at all" fluent in sign language; and she performed no tests or evaluations to determine Ms. Yellin's communication abilities. *Id.* 110:7–111:15. She has no publications related to deafness. *Id.* 18:24-19:4. She has no understanding of how much language someone can pick up through lip-reading. Freitas Dep. 120:21–24. She lacks meaningful familiarity with cochlear implants, *see id.* 112:16-113:9, a limitation evident in her report, where she mistakenly refers to Ms. Yellin's cochlear implants as "hearing aids"—an entirely different medical device, *see* Ex. B at 18. And as explained above, although she offers the opinion that the Rehabilitation Act was not violated, she admitted she had only "some familiarity" with it. Ex. C 44:13–45:7. And she concedes she would not be qualified to lecture on ADA and "how to ensure that clinical practice appropriately implements those requirements in clinical care" at more than a "superficial[]" level.[1] *Id.* 133:4-18. Dr. Freitas demonstrates no qualifications that support the

---

[1]      Dr. Frietas's lack of familiarity is evident in the fact that her opinion does not consider the right questions. The ADA does not ask merely whether a "jail made efforts" to accommodate a person or whether accommodations were "categorically denied or withheld." Ex. B at 19. The governing regulation requires a public entity to ensure that communications with disabled individuals are "as effective as communications with others," to provide auxiliary aids and services where necessary to afford an equal opportunity to participate in and benefit from services, and to give "primary consideration" to the individual's requested auxiliary aid or service. *See* 28 C.F.R.

reliability of her testimony. *See Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 441 (D. Md. 2016) (experts lacking experience with deafness cannot reliability testify to how a potential employee would have worked with an accommodation).

### 3. Dr. Freitas's Causation Opinion Relies on Her Inadmissible ADA Opinion and Is Therefore Unreliable.

Dr. Freitas identified section four of her Report as her damages opinion. Ex. B at 19; Ex. C 37:10-21. Section four states that Ms. Yellin's symptoms are consistent with "pre-existing conditions and the general environment of incarceration," "rather than being directly caused or substantially exacerbated by any specific violation of disability law." Ex. B at 19. Freitas Dep. 126:1–127:25.

That opinion is predicated on Dr. Freitas's determination that disability law was not violated. Her deposition confirms the problem as she testified that this opinion was based on Ms. Yellin's "ability to communicate and express her feelings and desires and wants." Freitas Dep. 126:1–127:12. But Dr. Freitas does not assess Ms. Yellin's ability to communicate and to express her feelings, desires, and wants in offering her ADA accommodation opinion. And, for the reasons explained above, Dr. Freitas is not qualified to testify about violations of disability law anyway. That inadmissible opinion infects her causation/damages opinion, and therefore she should not be able to offer an opinion on causation and damages in this case.

---

§ 35.160. Dr. Freitas does not apply that standard. Having no expertise in the subject matter, all she does is a record review, providing nothing that the lay jury cannot already do for themselves. *See* Ex. B at 19 ("the record documents frequent contact with case management, ADA advocates, mental health professionals, and medical staff," "the medical record demonstrates she consistently denied suicidal ideation," and "[t]he jail records do not support a pattern of deliberate indifference or service denial.").

4.   **Dr. Freitas's "Cruel and Unusual Punishment" Opinion Should Be Excluded Because Her Data and Methodology Are Unreliable, Under-disclosed, and Not Reliably Tied to Her Conclusions.**

Dr. Freitas opines that Ms. Yellin did not experience cruel and unusual punishment and that she did not experience "serious and significant emotional injury" from solitary confinement. Ex B at 18. Her opinion relies on two broad categories of material to support her opinions about solitary confinement, PTSD, and psychiatric injury: a review of jail and medical records, and multiple psychometric instruments she administered to Ms. Yellin. Both categories suffer from reliability and disclosure problems.

i.   **Dr. Freitas's solitary-confinement opinion rests on an undefined standard.**

Dr. Freitas opines that Ms. Yellin was not in solitary confinement or near-total isolation, but she does not identify a stable standard she is applying. Opinion 2 states that Ms. Yellin reported "near-total isolation for approximately 23 hours per day"; that such restriction is "consistent with what is commonly referred to as 'solitary confinement.'" Ex. B at 18. She then determined that Ms. Yellin was not in solitary confinement because records show she was "not deprived of regular human contact or access to services." *Id.* At her deposition, though, she resisted defining solitary confinement at all, saying the definition is "fairly scholarly debated" and "we don't have one [definition] actually." Freitas Dep. 91:22–92:1.[2] Despite invoking a scholarly debate, Dr. Freitas cites no scholarly source, correctional standard, or other authority in her report for the definition of solitary confinement that she purports to apply when opining that Ms. Yellin was not kept in solitary confinement. If Dr. Freitas is unwilling to define solitary confinement, Dr. Freitas should

---

[2] It is not clear what "we" Dr. Freitas is referring to as she is not an authority on solitary confinement. Ex. C 18:18-19:2, 22:25-23:9, (testifying that she has no publications specific to prison conditions, jail conditions, solitary confinement, or isolation, and she has no experience "writing or taking a position on solitary confinement.").

22

not be permitted to tell the jury that the definition was not satisfied and Ms. Yellin was not in solitary confinement.

**ii.      Dr. Freitas's psychometric-instrument opinions are unreliable because she failed to disclose the data relied on in her analysis.**

Rule 26 and Rule 702 work together. Rule 26 requires a retained expert report to disclose "a complete statement of all opinions … and the basis and reasons for them" and "the facts or data considered by the witness in forming them," Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii), and Rule 702 then requires the proponent to show that the testimony is "based on sufficient facts or data" and that the opinion "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d). The Advisory Committee has explained that "the sufficiency of the basis of an expert's testimony is to be decided under Rule 702" and that the sufficiency analysis "cannot be divorced from the ultimate reliability of the expert's opinion." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

The failure to disclose the underlying facts and data under Rule 26 results in automatic exclusion under Rule 37 unless Defendants can prove substantial justification or harmlessness. Fed. R. Civ. Pro. 37(c). But even if Defendants can prove substantial justification or harmlessness, Defendants cannot prove and the Court cannot determine that that Dr. Freitas reliably applied her methodology to the facts she relied on if she never discloses those facts. *See Flagstone Dev. LLC v. Rocky Mountain Timberlands, LLC*, 2017 WL 3820948, at *2 (D. Mont. Aug. 31, 2017) ("[O]pinions based on undisclosed facts, methodology, and principals do not allow the Court to examine the soundness of the expert's conclusions under *Daubert* and will not be allowed at trial."); Fed. R. Evid. 702 (proponent of an expert must demonstrate that the expert's "testimony is based on sufficient facts or data").

Dr. Freitas administered several psychometric instruments, but her report fails to disclose all of the underlying data necessary to test her opinions. Take, for example, the MMPI-3. Dr. Freitas testified that the MMPI-3 is an assessment where Ms. Yellin selected answers to questions, Dr. Freitas pushed a "magic button" which produced a software-generated "preliminary report" that Dr. Freitas then analyzed. Freitas Dep. 56:25–57:12. That preliminary report included "all the scales," "a multitude of numbers," "graphs," and was "very scientific" in "the way it comes out." Freitas Dep. 57:13–58:1. But none of that—the Ms. Yellin's underlying responses, the preliminary report, nor the scales, numbers, or graphs—are disclosed in her report or were otherwise produced, only Dr. Freitas's analysis and conclusions from them. *See* Ex. B at 9.

The same problem extends to the other instruments. The PID-5 is also a self-report instrument for which Ms. Yellin "went through the questions and answered them," Ex. C 58:2–15, but Ms. Yellin's answers are not disclosed; the MDQ is reported as Ms. Yellin having "endorsed 12 of 13 symptoms," without the actual questions, answers, or scoring, Ex. B at 9–10; and the CAPS-5 involved specific questions, clinician assessment, severity ratings or tallies, and answers that Dr. Freitas testified are "in the CAPS-5," Ex. C. 71:5–73:19, 80:16–81:1, that likewise were not identified.

The CAPS-5 disclosure problem is especially significant because, at deposition, Dr. Freitas introduced new bases for her opinion that Ms. Yellin does not have PTSD based on the outcome of a CAPS-5 assessment. Dr. Freitas's report concluded *without any explanation* that "Ms. Yellin does not meet criteria for PTSD." Ex. B at 10; *see also* Ex. D, Dr. Stuart Grassian's Supplement to Psychiatric Report Concerning Laura Yellin and Rebuttal Report at 3 (Nov. 7, 2025) (noting that "Dr. Freitas provides no information that she actually obtained from administering that scale" but "she simply asserts without establishing any evidentiary basis (i.e. what Ms. Yellin actually

24

stated in response to the CAPS-5 interview questions) that the scale did not indicate that Ms. Yellin met criteria for PTSD."); *id.* at 4 ("Dr. Freitas' report fails to explain the basis for her conclusion"). This is wholly conclusory, "because I said so" opinion; the mere identification of a methodology and the statement of a conclusion leaves an "analytical gap" that is "too wide" to be deemed reliable. *ePlus, Inc. v. Lawson Software, Inc.*, 764 F.Supp.2d 807, 813-15 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) (excluding *ipse dixit* expert testimony and noting courts have the discretion to do so when there is "simply too great an analytical gap between the data and the opinion proffered"); *Plantan*, 2024 WL 3048648, at *9-12 (E.D. Va. June 18, 2024) . But, even if reliable, the *only* criterion mentions in the report is Criterion A.  Ex. B at 10. Yet, at her deposition, Dr. Freitas testified that her no-PTSD opinion was "not just A," but also based on the fact Ms. Yellin "did not satisfy criteria for Criterion H," "no longer met criteria for G," and "did not meet Criterion E. " Freitas Dep. 79:12–25. She testified that she would have to refresh her memory on whether Ms. Yellin met Criterion D—but to refresh her memory, she would review the undisclosed CAPS-5 assessment because her "report does not mention each criteria." Freitas Dep. 80:1-12. That is a Rule 26 failure: Dr. Freitas conditions the opinions she intends offer on reviewing an undisclosed CAPS-5 report. Rule 37(c) requires this kind of undisclosed information to be excluded. It is also a Rule 702 failure because the Court cannot determine whether Dr. Freitas reliably applied the CAPS-5 methodology if Dr. Freitas cannot even recall the basis of her own opinions.

Defendants cannot meet their burden to prove that the opinions reliably apply underlying data to the methodology to reach a conclusion if they have not disclosed or identified what that data is. This is black box testimony spitting out a conclusion with any decipherable, re-creatable indication of how it was reached. *United States ex rel. Lutz v. Lab'y Corp. of Am. Holdings*, 2021

25

WL 2801736, at *5 (D.S.C. July 6, 2021) (excluding expert testimony in part because of "the absence of reliable data"), *clarified on denial of reconsideration,* 2022 WL 688988 (D.S.C. Feb. 23, 2022).

### iii.    Dr. Freitas's opinions are unreliable because she inaccurately described her own assessment tools.

Not only can Defendants not demonstrate reliability due to Dr. Frietas's lack of underlying data, but Dr. Freitas also cannot prove that she administered the CAPS-5 in a reliable way.

Her testimony about her use of the CAPS-5 contradicts the information provided by the Department of Veterans Affairs, who authored the assessment. When asked whether she received specific training on the CAPS-5, she testified that "[t]here is no specific training on CAPS-5 because it's a structured interview." Freitas Dep. 65:2–7; *see also id.* 65:8-16 (there is not "any type of special training on how to administer it."). But there is. *See* Nat'l Ctr. for PTSD, U.S. Dep't of Veterans Affs., *Clinician-Administered PTSD Scale for DSM-5 (CAPS-5)*, https://ptsd.va.gov/professional/assessment/adult-int/caps.asp [hereinafter VA's CAPS-5 Page] (with a section entitled "CAPS-5 Training").

Dr. Freitas also testified that CAPS-5 did not involve scoring. Indeed, when asked whether she agreed that "standard administration and scoring of the CAPS-5 are essential for producing reliable and valid scores and diagnostic decisions"—language drawn from the CAPS-5 itself, *see* Ex. E, Freitas Dep. Ex. 4, *Clinician-Administered PTSD Scale for DSM-5 (CAPS-5), Past Month Version*, at 3 (Apr. 13, 2018)[3]—Dr. Freitas disagreed on the basis that the CAPS-5 does not involve scoring. Freitas Dep. 70:17–72:12. But the VA's own guidance confirms that the CAPS-5 *does* involve scoring, *see* VA's CAPS-5 Page (section on "Administration and Scoring"), and the VA's

---

[3]    This exhibit was offered during the deposition. On redirect, Defendants' counsel *corrected* the record that this Exhibit is a version of the CAPS-5 but is not the version Dr. Freitas used. Ex. C 157:10–22. The version she used was never disclosed.

26

four-part CAPS-5 training includes coursework on "administration and scoring of the CAPS-5" and has an objective to "[a]pply the CAPS-5 scoring criteria appropriately." Nat'l Ctr. for PTSD, U.S. Dep't of Veterans Affs., *Clinician-Administered PTSD Scale for DSM-5 (CAPS-5) Clinician Training Curriculum*, https://www.ptsd.va.gov/professional/continuing_ed/caps5_clinician_ training.asp.

It is not even clear which version of the CAPS-5 Dr. Freitas administered to even know what methodology she applies in reaching her conclusions. The VA identifies three versions of the assessment: past week, past month, and worst month (lifetime). *See* VA's CAPS-5 Page. Yet, Dr. Freitas testified at one point she attempted to use the "worst month" version but ended up using "the last month." Freitas Dep. 67:2-11. Later, however, she testified that she "did past month and whole month." Freitas Dep. 82:10–18. When asked whether her reference to "whole month" was the same as "worst month," she said they were not the same assessment. Freitas Dep. 82:19–83:1. Then on redirect, she said she had used "the form for past month/worst month." Freitas Dep. 157:10–22. This contradictory testimony that uses names for the assessment that do not match the actual assessment makes it impossible to even know which methodology she applied to reach her conclusions, let alone whether it was applied reliably.

### 5. Dr. Freitas's Deliberate Indifference to Medical Needs Opinion Should Be Excluded Because It Is Wholly Conclusory and No More Than Record Narration.

Dr. Freitas's opinion that Ms. Yellin was not treated with deliberate indifference in regards to her medical care should be excluded as wholly conclusory. *See ePlus, Inc.*, 764 F.Supp.2d at 815. Dr. Freitas diagnosed Ms. Yellin with "Unspecified mood [affective] disorder, in the peripartum period, severe, with psychotic features," and acknowledges a "very well documented history of psychosis in the peripartum period." Ex. B at 17. Dr. Freitas even opines later that Ms. Yellin's *mental health conditions* were significant to constitute *legal disabilities*. *Id.* at 18. She

27

nevertheless concludes without explanation that "Ms. Yellin, while incarcerated at the Arlington County Jail did NOT present with any 'substantial' – emergent or urgent – medical nor psychiatric needs." *Id.* at 17. She gives no basis for this conclusion, and it flatly contradicts her own acknowledgement of the severity of Ms. Yellin's condition. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001) (affirming lower court's exclusion of ipse dixit testimony by an expert and noting "nothing in either Daubert or the Federal Rules of evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert" (quoting *Kumho Tire,* 526 U.S. at 157)).

Furthermore, Dr. Freitas goes on to support her opinion that Ms. Yellin's needs were not "neglected or withheld" with a bullet-point list of record references. *Id.* at 17. But she does not explain what treatment her own diagnosis required, whether the listed events were treatment for that condition, whether that treatment was timely or adequate, or how those record entries show that care was not neglected or withheld. An expert cannot diagnose a severe condition, list unexplained record events, and then announce that no care was denied without explaining how the events addressed the condition. That is not expert analysis or opinion; it is a human highlighter, narrating Defendants' preferred records when a lay juror can read the records for themselves. The Court should exclude Opinion 1 because it does not apply a reliable methodology.

### 6.    Dr. Freitas Should Be Limited to the Opinions Disclosed in Her Report.

28

**C.      Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that the Court exclude Dr. Freitas' testimony in full. In the alternative, Plaintiff requests that the Court limit the testimony to only those opinions resting on properly disclosed information.

Dated:  May 6, 2026                    Respectfully submitted,

/s/ Ian S. Hoffman
Ian S. Hoffman (VSB 75002)
Preston Smith (VSB 96908)
Samantha C. Smith (*pro hac vice*)
ARNOLD PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Tel.: 202-942-6406
Fax.: 202-942-5999
Ian.Hoffman@arnoldporter.com
Preston.Smith@arnoldporter.com
Samantha.Smith@arnoldporter.com

Drake Wu Cheng Darrah (*pro hac vice*)
National Association of the Deaf
8630 Fenton Street, Suite 202
Silver Spring, MD  20910
Drake.darrah@nad.org
Tel.: 301-587-1788
Fax: 301-587-1591

*Counsel for Plaintiff Yellin*

29

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of May 2026, I caused the foregoing to be filed electronically using the Court's CM/ECF system, which automatically sent a notice of electronic filing to all counsel of record.

/s/ Ian S. Hoffman
Ian Hoffman (VSB 75002)
ARNOLD PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
T: 202-942-6406
F: 202-942-5999
Ian.Hoffman@arnoldporter.com

*Counsel for Plaintiff Laura Yellin*